**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**


United States of America,                                             Case No. 3:18CR32

        Plaintiff

        v.                                                                    **ORDER**

Xiaolei Gu,

        Defendant

Pending in this criminal case is the defendant's motion to suppress. (Doc. 17). Following an evidentiary hearing and submission of post-hearing briefs, the motion is decisional. For the reasons that follow, I deny the motion.

On November 10, 2017, Ohio State Highway Patrol Trooper Stroud clocked the defendant driving 81 mph; the limit was 70. He stopped the defendant, issued a citation, and asked her if he could search her pickup truck. She declined to allow the search.

Before sending the defendant on her way, Trooper Stroud had noticed some odd things: a new suitcase on the back seat with price tags still attached and another luggage bag in the bed of the truck. Also, the route the defendant and her passenger had and were taking – the defendant had flown to St. Louis, rented the pickup truck, picked up her passenger in Chicago, and was driving to New York. Perhaps not so odd in itself, but added to that was that the the putative purpose for the travels – to move a friend's belongings – seemed peculiar. At the evidentiary hearing Trooper Stroud observed that people usually pack in boxes, not suitcases, when moving their belongs.

This combination of circumstances added up, in the Trooper's mind, to a concern that criminal activity might be underway. He also acknowledged that the refusal to give consent "possibly played" a role in that concern. (Doc. 21, Tr. Pg. ID# 459, l-4).

Trooper Stroud notified a colleague, OSHP Trooper Wilt, about the stop and his observations. Stroud told Wilt about the stop and asked her to "keep her eyes out" for the defendant's vehicle. Trooper Wilt saw the defendant drive past and followed her. While following her, Trooper Wilt had contacted Agent Lalonde at Customs and Border Patrol, a K-9 handler, to involve him in a possible traffic stop of the defendant.

Trooper Wilt saw the defendant, who otherwise was driving lawfully, go to her right over the broken lane line that separated the freeway driving lanes and an on-ramp.

After stopping the defendant, Trooper Wilt obtained her license. Her dashcam indicates that Agent Lalonde had arrived about two minutes after the stop (*See* Doc. 24, pg. ID #243). He walked his dog around the defendant's truck. The dog alerted. By then, the dashcam shows, thirteen minutes, forty-eight seconds had passed since the stop. (*See* Doc. 24 pg. ID #243). On further inspection, the officers found a rock of methamphetamine on the floor of the passenger seat.

In a full vehicle search the officers discovered several fake credit cards, some blank and some completed false drivers licenses, and items, some corresponding with the names on the fake credit cards, for making the cards.

The defendant asserts two challenges in support of her motion: 1) Trooper Wilt's stop violated Ohio law; and 2) Trooper Wilt had prolonged the stop unnecessarily and in violation of Constitutional norms to permit Agent Lalonde to conduct the drug dog check.

Neither objection has merit.

## A. The Lane Violation Stop Was Lawful

Ohio's lane-change statue states that a vehicle "shall be driven, as nearly as is practicable, entirely within a single lane or line of traffic and shall not be moved from such lane or line until the driver has first ascertained that such movement can be made with safety." O.R.C. § 4511.33(A)(1).

Reading this provision in a common-sense manner, it is clear that the General Assembly requires drivers on multi-lane highways, absent some reason to change lanes, to stay in the same driving lane. Contrary to the defendant's argument, the mere fact that the defendant's lane of travel took her by an on ramp along broken lines did not relieve her of that duty. Whether marked with broken or unbroken lines, her lane of travel and direction remained the same. Swerving over that line created the same hazard as swerving over the solid line to her left. Regardless of markings, her lane of travel was unchanged.

Trooper Wilt lawfully stopped the defendant for a violation of the marked lane statute.

## B. The Dog "Sniff" Was Lawful

The parties dispute whether the approximately fourteen-minute delay between the start of the stop and the dog's alert exceeded the time incident to a routine traffic stop.[1]

---

[1] Trooper Stroud testified that "a smooth traffic stop [takes] approximately ten to twelve minutes, depending on the trooper." (Doc. 21, Tr., pg. ID #84). When the prosecutor asked Trooper Wilt, "[h]ow long does a typical traffic stop take from start to finish, best case scenario," she answered, "approximately fifteen minutes." (*Id.*, pg. ID #171).

Averages, however, are irrelevant. *See U.S. v. Bell*, 555 F.3d 535, 541 (5th Cir. 2009) ("[W]e do not focus on the length of this stop as compared with the average traffic stop, but rather on 'whether [the Officers] improperly extended the duration of the stop to enable the dog sniff to occur' in the particular circumstances of this case.") (quoting *U.S. v. Caballes*, 543 U.S. 405, 408 (2004)).

The cause, proper or improper, for the delay does not matter. This is because reasonable suspicion existed before the stop occurred to detain the defendant for the dog sniff to occur. That suspicion had arisen during Trooper Stroud's initial stop, which the defendant has not challenged.

As the Sixth Circuit stated in *U.S. v. Winters*, 782 F.3d 289, 297 (6th Cir. 2015) (citation omitted):

> Once the original purpose of the traffic stop . . . has been completed, the occupants "cannot be further detained unless something that occurred . . . caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot.

When an officer has that degree of suspicion, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

This gives rise to the two dispositive questions: 1) was there sufficient "reasonable and articulable suspicion" to enable Trooper Wilt to detain the defendant to enable the dog "sniff;" and 2) was using the dog the "least intrusive means" to accomplish the officers' desire to find out whether the vehicle contained drugs?

With regard to the meaning of "reasonable suspicion," the Supreme Court has made clear that such suspicion is more than a hunch, but less that probable cause:

> The officer, of course, must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'" The Fourth Amendment requires "some minimal level of objective justification" . . . . That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means "a fair probability that contraband or evidence of a crime will be found," and the level of suspicion required for a Terry stop is obviously less demanding than that for probable cause."

*U.S. v. Sokolow*, 490 U.S. 1, 7 (1989) (citations omitted).

The record does not specify whether Trooper Stroud told Trooper Wilt why he wanted her to "keep her eyes out" for the defendant. But that, too, does not matter.

In assessing whether reasonable suspicion justified an otherwise unjustifiable delay, I apply the "collective knowledge" or "fellow officer" rule. Thereby I "impute collective knowledge among multiple law enforcement agencies, even when the evidence demonstrates that the responding officer was wholly unaware of the specific facts that established reasonable suspicion . . . ." *McCallum v. Geelhood*, 742 Fed. App'x 985, 993 (6th Cir. 2018). Thus, if the information known to Trooper Stroud created reasonable suspicion, Trooper Wilt could detain the defendant, just as if she had had obtained that information firsthand.

What Trooper Stroud had seen and heard met that level of suspicion. The route and putative purpose of the trip – to move some third person's belongings from St. Louis to New York – seemed odd. Implausible answers are a common factor that support reasonable suspicion. *E.g., U.S. v. Bonilla*, 357 Fed. App'x 693, 699 (6th Cir. 2009) ("Inconsistencies in the claimed purpose of a trip may be grounds for reasonable suspicion."). Likewise, a "small amount of luggage [is] inconsistent with moving to a new state." *U.S. v. Calvetti*, 836 F.3d 654, 667 (6th Cir. 2016). A price tag attached to apparently new luggage can also be a factor leading to reasonable suspicion. *U.S. v. Lemuz*, 2017 WL 9480192, at *4 (D. Neb. 2017). The use of the suitcase and a luggage bag, to move someone's entire belongings also supported the reasonableness of the suspicion. These observations, scant though they may have been, *in toto* justified Agent Stroud's conclusion that the car may have contained drugs.[2]

---

[2] Though Trooper Stroud did not so state, I take judicial notice that the Ohio Turnpike is a favored route for cross-country conveyance of illegal drugs.

5

Secondly and indisputably, use of a drug detection dog, which was not even a "search,"[3] was the least intrusive way to confirm or dispel the suspicion about drugs in the truck. The only other alternative, to obtain consent, even it had been given, would have led to a vastly greater intrusion into the defendant's privacy.

**Conclusion**

Trooper Wilt made an entirely valid on-view lane violation stop. Even if she did not know whether or how Trooper Stroud had reasonably suspected there were drugs in the truck, which seems unlikely, she could, under the collective knowledge doctrine, detain the defendant to enable the drug dog sniff.

In sum, there was nothing improper or unlawful about how Trooper Wilt got and the government will use the evidence that the defendant wants suppressed.

It is, accordingly,

ORDERED THAT the defendant's motion to suppress (Doc. 17) be, and the same hereby is denied.

So ordered

/s/ James G. Carr
Sr. U.S. District Judge

---

[3] *Illinois v. Caballes*, 543 U.S. 405 (2005); *United States v. Place*, 462 U.S. 696, 707 (1983).